IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PETER MOEDE,                        )
                                    )
    Plaintiff and                 )
    Counterclaim Defendant,       )
                                    )
  v.                                )   No. 07 C 1726
                                    )
KEITH POCHTER, et al.,              )
                                    )
    Defendants and Counter        )
    and Cross Claimants.          )

## MEMORANDUM OPINION AND ORDER

Peter Moede ("Moede") filed this suit to recover his share of the proceeds in a sale of property in which he was one of five investors. Three of the four co-investor defendants--Ronald Sandler ("Sandler"), Mitchell Miller ("Miller") and Robert Michelson ("Michelson")--have moved for partial summary judgment on their counterclaim for breach of contract.[1] For the following reasons, their motion is denied.

### Procedural Issues

Two aspects of defendants' factual statements do not conform to the requirements of this District Court's LR 56.1. Those issues will be addressed at the outset, before this opinion turns to the merits.

First, defendants' response to Moede's statement of

---

[1] Keith Pochter ("Pochter"), the fourth defendant, is not involved in the current motion. This opinion therefore uses "defendants" as a collective term to refer to the three present movants.

additional facts ("D. Resp.") includes claimed surreplies to eight of Moede's responses to defendants' original factual submission. But LR 56.1(a)(3) does not permit that. Instead it allows a movant to submit only a concise response to the nonmovant's statement of additional facts, in the same form as that prescribed for the nonmovant's response to the movant's original statement: "numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed, and a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon" (LR 56.1(b)(3)(B)). Moreover, a response to a statement of facts (or to a statement of additional facts) "is not the place for purely argumentative denials," an apt description of defendants' improper surreplies (see Malec v. Sanford, 191 F.R.D. 581, 584 (N.D. Ill. 2000)). So the purported surreplies will be disregarded.

Second, Moede contends that defendants' LR 56.1 statement of facts ("D. St.") should be stricken because all or part of D. St. ¶¶12, 14, 22 and 23 contain no record citations. Although failure to comply with the LR requirements may indeed constitute grounds for denial of a motion, such a draconian measure is not appropriate here. Moede seeks to rely on Mount v. LaSalle Bank Lake View, No. 92 C 5645, 1998 WL 381971 (N.D. Ill. July 2),

where plaintiffs backed up none of their factual statements with citations to the record and also filed an amended fact statement "[w]ell past even the proverbial eleventh hour" (id. at *4).[2] By contrast, the vast majority of defendants' statements here did include record citations. In addition, Moede (unlike the defendant in Mount) would not be prejudiced by consideration of defendants' four unsupported statements, for he has submitted substantive responses to those statements along with his objection. Hence defendants' LR 56.1 statement will not be stricken.

## Background

On April 20, 2004 Moede, Pochter and the defendants entered into an Operating Agreement ("Agreement") to form BD Venture 2 LLC ("BD"), an Illinois limited liability company (D. St. ¶7). BD was created to own a 50% interest in Mt. Prospect Partners, LLC, a company that was to manage, develop and sell a parcel of real estate (the "Land") in Mount Prospect, Illinois (id. ¶8). Under the Agreement Moede would contribute $125,000 to the venture to hold a 50% interest in BD (id. ¶10), while each defendant would contribute $25,000 for a 10% interest (id.) and Pochter, who was designated as BD's managing member, would contribute $50,000 for a 20% interest (id. ¶¶9-10).

Shortly after BD's formation, each defendant contributed his

---

[2] That case dealt with the predecessor rule to LR 56.1.

$25,000 share (D. St. ¶11). Although between May 2003 and May 2004 Moede made several payments to Pochter totaling $38,250, he did not fund his contribution fully until January 2006 (M. St. ¶25).³ Nonetheless, BD's 2004 tax return (D. Ex. B) reported that he had paid his full $125,000 contribution that year.

On October 24, 2006 Pochter sent an email to Moede and defendants (D. Ex. F) stating that BD had received an offer to buy its 50% stake in Mt. Prospect Partners for $200,000 (D. St. ¶15). Pochter recommended going forward with the sale, and he asked the others to let him know if they objected to his doing so. Moede did not respond to the email immediately (M. St. ¶30). Pochter went ahead with the sale anyway--indeed, it appears he had approved the deal even before he emailed his partners, for on October 25 a deposit was made of a $200,000 check dated October 24 (D. Ex. I).

That unilateral action by Pochter violated the Agreement, which required the consent of the LLC members holding a majority of the percentage interests for specified "major decisions," including "approving the selling of all or substantially all of the assets of [BD]" (D. Ex. A at §6.3). Because Moede held a 50% interest, that necessarily required his approval, which he had not given (M. St. ¶30).

On or about October 27, 2006 each defendant received $29,000

---

³ "M. St." refers to Moede's Statement of Additional Facts.

from Pochter--an amount equal to his original capital contribution plus a return on the investment (D. St. ¶21). After Miller advised Moede's accountant Daryl Nirode ("Nirode") that defendants had received those distributions, Moede directed Nirode to ask Pochter for his distribution from the sale (M. St. ¶¶32-33). Moede received a $100,000 check from Pochter on December 15, 2006, but he was unable to cash the check because a stop payment order had been placed (id. ¶33). Moede then received a second $100,000 check on December 27, 2006, but he was unable to cash that one because there were insufficient funds to cover it (id.).

Pochter later disappeared, and in June 2007 Moede obtained a $125,000 default judgment against him in this action. Moede has been unable to collect on the judgment.

## Jurisdiction and Venue

Jurisdiction exists here under 28 U.S.C. §1332(a),[4] for there is the requisite diversity of citizenship and the amount in controversy exceeds $75,000. Venue is proper both (1) under Section 1391(a)(1) because all defendants reside in the Northern District of Illinois and (2) under Section 1391(a)(2) because a substantial part of the acts or omissions alleged in the Complaint occurred in this judicial district.

---

[4] All further references to Title 28's provisions will simply take the form "Section--."

That current posture of the case has cured an earlier jurisdiction defect, for Moede's original Complaint for Declaratory Judgment had included BD as a defendant. That Complaint was dismissed without prejudice because BD's presence destroyed complete diversity--numerous cases exemplified by Thomas v. Guardsmark, LLC, 487 F.3d 531, 534 (7th Cir. 2007) teach that the citizenship of an LLC is that of each of its members. Moede was then permitted to file a Third Amended Complaint, omitting BD as a defendant and thus creating complete diversity.

## Standard of Review

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby,

6

Inc., 477 U.S. 242, 248 (1986)).

### Defendants' Required Proof

To begin with the always-threshold choice of law question, both the Agreement and the parties' concurrence look to Illinois substantive law to resolve the issues now in dispute. To succeed on their counterclaim for breach of contract, defendants must plead and prove the existence of a contract, their performance of its conditions, a breach by Moede and consequent damages (Larsen v. Carle Found., 386 Ill.App.3d 799, 803, 898 N.E.2d 728, 731 (4th Dist. 2008)). There is no dispute that the Agreement was a legally binding contract and that defendants performed as required by providing their $25,000 contributions soon after the Agreement was signed. Hence the two contested issues are whether Moede breached the Agreement and, if so, whether defendants suffered damages as a result.

### Breach of Contract

Defendants first argue that Moede committed a material breach when he failed to pay nearly $96,000 of his required $125,000 contribution to BD for almost 20 months after the LLC was formed. Moede responds that because the Agreement did not specify a date by which each member's contribution had to be made, there is a factual question as to whether he made his payment within a reasonable time.

In Illinois, "[w]here a contract does not specify a time for

7

performance, a reasonable time will be implied" (In re Marriage of Tabassum & Younis, 377 Ill.App.3d 761, 773, 881 N.E.2d 396, 408 (2d Dist. 2007)). That concept of a "reasonable time" for performance connotes a time period that "is necessary to do conveniently what the contract requires" (Wilmette Partners v. Hamel, 230 Ill.App.3d 248, 257, 594 N.E.2d 1177, 1184 (1st Dist. 1992)). That determination "depends upon the subject matter of the contract, the circumstances attending performance of the contract, and the situation of the parties to the contract" (Int'l Union, United Auto Workers v. Randall Div. of Textron, Inc., 5 F.3d 224, 230 (7th Cir. 1993)(applying Indiana law)). Ultimately what constitutes a reasonable time is a question of fact (Wilmette Partners, 230 Ill.App.3d at 257, 594 N.E.2d at 1184).

Cases applying those precepts have diverged significantly in deciding what is considered a reasonable length of time for performance, for each case is fact-specific (see, e.g., Tabassum, 377 Ill.App.3d at 773, 881 N.E.2d at 408-09 (five months was reasonable); Cruz v. Globe Realty Mgmt. Co., No. 03 C 9298, 2005 WL 3455846, at *4 (N.D. Ill. Dec. 13)(five-month delay in performance was unreasonable)(applying Illinois law); Murphy v. Roppolo-Prendergast Builders, Inc., 117 Ill.App.3d 415, 417, 453 N.E.2d 846, 848 (1st Dist. 1983)(whether 19 months was unreasonable was a question of fact); Hanson v. Duffy, 106

8

Ill.App.3d 727, 731, 435 N.E.2d 1373, 1377 (2d Dist. 1982)(six months or thereabouts was limit of reasonable time), and <u>Yale Devel. Co. v. Aurora Pizza Hut</u>, 95 Ill.App.3d 523, 526, 420 N.E.2d 823, 825 (2d Dist. 1981)). But unsurprisingly, none of those cases dealt with the specific question of defining a reasonable time for contributions to be made pursuant to an LLC agreement.

Moede avers that he made a total of $134,187 in payments to the venture: $12,500 on May 1, 2003; $18,750 on December 11, 2003; $7,000 on May 1, 2004, and $95,937 on January 4, 2006 (M. St. ¶¶25-26).[5] Moede explains that he made the first two contributions before BD was formed to enable the purchase of the Land, and he attributes his delay in paying the remainder of his contribution to the fact that Pochter told him it was unnecessary (it will be remembered that Pochter was designated as BD's manager).[6]

---

[5] D. Resp. ¶25 denies that Moede made any payments because the checks came from the account of Atlas Development Corporation, an entity in which Moede is apparently a part owner. Yet throughout their briefs defendants concede that Moede eventually funded his share in full. That aside, lawyers ought to think twice before advancing such makeweight irrelevancies--the type of bootless contention that may create a risk that more legitimate arguments could suffer because of concerns as to counsel's credibility.

[6] Defendants argue that Moede's account of Pochter's statement is hearsay, not falling within any exception to the hearsay rule. Not so--it is nonhearsay, admissible not for the truth of the matter asserted but for its bearing on Moede's conduct in light of the statement (Fed. R. Evid. 803(1)).

9

That explanation is bolstered by a May 17, 2004 email (D. Ex. N) from Pochter to Moede, which was accompanied by a copy of a revised Agreement because "[s]everal of [his] partners decided to take an interest in the development." In that email Pochter asked Moede to sign and return the revised Agreement and to send a check for $7,000 to cover Moede's share of a Nuisance Deposit Agreement with the City of Mt. Prospect  Nowhere in that email or in any other part of the record that preceded a November 22, 2005 email (M. Ex. B) from Pochter did he ask for the balance of Moede's $125,000 contribution. Moede then tendered a check for the balance on January 4, 2006.

D. Resp. ¶27 disputes Moede's explanation and points to Nirode's testimony (D. Ex. E at 43-44) that Moede deliberately withheld payment to get Pochter to produce the accounting records from another transaction involving Moede and Pochter. Even if that were true, Moede's delay in full performance does not appear to have impaired the fulfillment of the Agreement. Nothing suggests that BD was unable to "hold, improve, manage, develop, lease, operate and sell" the Land, as articulated in Agreement §2.1, as a result of Moede's delay. On that score this case differs from most other cases where courts have considered what constitutes a reasonable time for performance--cases in which, unlike here, the transaction was botched as a result of the delay. In sum, whether or not Moede breached the Agreement

10

clearly requires a factual resolution.

That conclusion is further supported by the Illinois Limited Liability Company Act ("Act," 805 ILCS 180/1-1 to 180/60-1). Although the breach-of-contract claim at issue here is governed by common law, BD was formed pursuant to the Act, which provides that LLC member contributions "may be in cash, property, services rendered, or a promissory note or other obligation to contribute cash or property or to perform services" (805 ILCS 180/20-1). That language suggests that a member may fulfill his contribution obligation with a promise to contribute cash in the future (Charles Murdock, 7 Ill. Prac., Bus. Org. §5.12 (2008)). Moede did that here, and he ultimately fulfilled his obligation. Additionally, his initial contributions of nearly $40,000 indicated a genuine commitment to the venture.

Given all of the circumstances, summary judgment as to the unreasonableness of Moede's delay is inappropriate. Instead that question must be resolved in factual terms.

## Damages

Although the second contested issue--damages--is contingent on the as-yet-unresolved question of a breach on Moede's part, the parties' competing submissions on the subject make it worthy of attention. It will be recalled that when Sir Edmund Hillary was asked why he had climbed Mt. Everest, his response was "Because it was there."

11

Defendants argue that Moede's delay in making his full contribution harmed them by (1) depriving BD (and therefore, they say, defendants themselves) of profits that could have been earned from the use of Moede's capital contribution and interest that would have accrued on it between May 2004 and January 2006, and (2) preventing defendants from obtaining certain tax benefits. Defendants also assert that Moede was unjustly enriched by holding onto nearly $96,000 for almost 20 months and by taking tax losses in years before he put in his full contribution.

As always, any party seeking to recover damages has the burden of proving them "to a reasonable degree of certainty" (Telemark Dev. Group, Inc. v. Mengelt, 313 F.3d 972, 983 (7th Cir. 2002)(applying Illinois law)). Damages are speculative when uncertainty exists as to the fact of damages, rather than to their amount (Beerman v. Graff, 250 Ill.App.3d 632, 639, 621 N.E.2d 173, 179 (1st Dist. 1993)). And, of course, the purpose of an "award of damages...is, so far as possible, to put the victim where he would have been had the breach...not taken place" (Chronister Oil Co. v. Unocal Refining & Marketing, 34 F.3d 462, 464 (7th Cir. 1994)(applying Illinois law)).

<u>Use of Capital</u>

To begin with, defendants' contention that Moede's delay in paying most of his capital contribution deprived BD of profits

12

that could have been earned from the use of that contribution really advances a potential claim of BD as an entity, not of defendants in their individual capacity (in much the same way that shareholders may not pursue a corporate claim on the premise that damages suffered by the corporation have lessened the value of the shareholders' interest).[7]

But that aside, defendants' theory itself contains inadequate factual support to warrant a finding of damage. Nothing in the record suggests that BD had other projects in the pipeline that it lacked capital to fund, or that it had to forgo any opportunities related to the Land as a result of a lack of funds. Without more, damages from such alleged lost profits are too speculative (see Razor v. Hyundai Motor Am., 222 Ill. 75, 107, 854 N.E.2d 607, 626 (2006)).

Accrual of Interest

In like fashion, defendants' argument that interest would have accrued on Moede's contribution advances a claim that, if valid, belongs not to them individually but to BD as an entity.

---

[7] It is unnecessary to explore at this time whether that proposition is impacted by the current status of BD (a matter on which this Court is not fully informed), even apart from the fact that BD is no longer a party to this case. Moreover, defendants have not proffered any authority to suggest that they might pursue their claim in an LLC context on a basis essentially equivalent to a shareholder's derivative suit in the conventional corporate context--an unexplored question made more complex by the fact that their target owns 50% of the LLC's membership interest.

But again apart from that potential flaw, defendants seek to support their argument by submitting a copy of a spreadsheet, purportedly prepared by BD's accountant, that refers to a bank account at Harris Bank (D. Ex. J). They also tender a copy of the Form 1099 for that account from 2004 (D. Ex. Q), reflecting interest income of $17.73. Because BD's account was interest-bearing, they argue that BD would have received a greater amount of interest income had Moede timely funded his contribution.

That contention confronts an obvious evidentiary problem--that of admissibility (see Rule 56(e))--at the outset. Although the documents on which defendants rely are potential candidates for the so-called business records hearsay exception (Fed. R. Evid. 803(6)), they lack the requisite authentication.

In that respect defendants have submitted only defendant Sandler's declaration that BD's accounting firm furnished him with the two documents. That is just not enough to do the job in evidentiary terms. But because that flaw may potentially be curable, a second--and substantive--roadblock to defendants' claim is the same point already made: that the loss if any would have been that of BD--in this instance the owner of the bank account--and not of defendants as individuals. For more than one reason, then, this second possible damage claim also fails.

Tax Benefits

BD's 2004 tax return (D. Ex. B) reports Moede's capital

contribution as $125,000.  BD's 2004 and 2005 tax returns (D. Exs. B and D) reflect Moede's reported losses as $23,538 and $21,891, respectively, while the 2004 return shows defendants' losses as $4,708 each.

Defendants argue that BD's reported losses should have been allocated on a basis proportional to some recalculated ownership percentages of each member.  Because Moede did not in fact put in his full $125,000 in 2004, defendants contend that prevented Moede from "owning" a 50% interest in BD, causing defendants to "own" a correspondingly larger share.  Although that position may be ingenious, defendants provide neither caselaw nor statutory citations to support it.

This Court is not of course empowered to provide defendants with the extracontractual remedy they seek, for "no court can rewrite a contract to provide a better bargain to suit one of the parties" (Cress v. Recreation Servs., Inc., 341 Ill.App.3d 149, 187, 795 N.E.2d 817, 852 (2d Dist. 2003)).  Here the Agreement, including its Schedule B entitled "Percentage Interests of the Members," could not have been more clear that Moede owned 50% of the interest in BD, while each defendant owned 10%.  As Cress, id. teaches, "where the terms of a contract are clear and unambiguous, they must be enforced as written."

Relatedly, the section of the Act entitled "Member's liability for contributions" provides that "[a] member's

15

obligation to contribute money, property or other benefit to...a limited liability company is not excused by the member's death, disability, or other inability to perform personally" (805 ILCS 180/20-5(c)). No provision in the Act calls for a member's forfeiture of his ownership interest.

Accordingly defendants may not recover damages on that theory either. That leaves unbroken only one possible string to defendants' damages bow--a subject to which this opinion now turns.

Unjust Enrichment

Defendants' final contention is that Moede was unjustly enriched when he held onto the bulk of the money he owed BD because "Moede had use of over [$95,000] for 20 months; [the defendants] did not" (D. Resp. 8). They also argue that Moede was unjustly enriched by allegedly taking tax losses in 2004 and 2005 when he had not fully funded his contribution in 2004.[8]

Unjust enrichment is an equitable remedy based on a contract implied in law (Wheeler-Dealer, Ltd. v. Christ, 379 Ill.App.3d 864, 872, 885 N.E.2d 350, 357 (1st Dist. 2008)). Consequently, "where the parties' relationship is governed by a contract, the doctrine of unjust enrichment has no application" (id.).

---

[8] Whether Moede actually took the tax losses is unclear. Moede denies that he did (Moede Aff. ¶¶16-17), but Nirode testified that Moede took a loss in 2004 (D. Ex. E at 92). However, as explained in this section, that question is irrelevant at this time.

16

That is really the end of the story. Here the parties' relationship is indeed governed by the Agreement, a legally binding contract. Hence defendants cannot call upon the equitable remedy they seek to invoke to recover from Moede.

Nor, as a matter of equity, should such a recovery be permitted. Each defendant received a $4,000 profit from the sale of BD's stake in the Land, for a total distribution of $29,000. Moede has received nothing. Clearly the parties did not envision Pochter absconding with BD's funds. It would be extraordinarily inequitable to permit defendants to enlarge the disparity in the parties' economic positions.

<u>Conclusion</u>

It is an understatement to say that genuine issues of material fact stand in the way of defendants' motion for summary judgment on their breach-of-contract counterclaim. For the reasons stated here, that motion is denied in its entirety.

_____
Milton I. Shadur
Senior United States District Judge

Date: August 27, 2009