```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
```

PETER MOEDE,                        )
                                    )
        Plaintiff and               )
        Counterclaim Defendant,     )
                                    )
    v.                              )    No.  07 C 1726
                                    )
KEITH POCHTER, et al.,              )
                                    )
        Defendants and Counter      )
        and Cross Claimants.        )

MEMORANDUM OPINION AND ORDER

Peter Moede ("Moede") filed this action to recover what he claims as his share of the proceeds of a sale of property in which he was one of five investors. Three of the four co-investor defendants--Ronald Sandler ("Sandler"), Mitchell Miller ("Miller") and Robert Michelson ("Michelson")[1] -- have moved for summary judgment on Moede's two counts charging breach of the Operating Agreement ("Agreement") and violation of the Illinois Limited Liability Company Act ("Act," 805 ILCS 180/1-1 to 180/60-1).[2] For the following reasons, their motion is granted in part

---

[1] Keith Pochter ("Pochter"), the fourth defendant, is not involved in the current motion. This opinion therefore uses "Movants" as a collective term to refer to the three coinvestors listed in the text. But because Movants are indeed defendants, this opinion will avoid the confusion that duplicate "M." abbreviations would create by designating Movant-submitted documents as "D.--," while documents submitted by Sandler individually will be cited "S.--" and documents submitted by Moede will be designated "M.--."

[2] Citations to the Act will take the form "Act §--," omitting the prefatory "805 ILCS 180/."

and denied in part.

## Standard of Review

Every Rule 56 movant bears the burden of establishing the absence of any genuine material factual dispute (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of disputed fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (<u>id</u>.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

## Factual Background

This Court's August 27, 2009 memorandum opinion and order ("Opinion") has already described many of the key facts in this case. Because some new facts have come to light since the issuance of the Opinion, this opinion will detail those facts with minimal reiteration of the factual background described in the Opinion.

On April 20, 2004 Moede and Movants, along with Pochter as

the sole designated manager, formed BD Venture 2 LLC ("BD"), a manager-managed limited liability company, for the purpose of holding a 50% interest in Mount Prospect Partners, LLC, a company that was to manage, develop and sell a parcel of real estate (the "Land") in Mount Prospect, Illinois (D. St. ¶¶8, 10). Gendell Busse Partners, represented by Scott Gendell ("Gendell"), owned the other 50% share in Mount Prospect Partners, LLC (G. Decl. ¶2[3]).

Gendell, who was also the manager of Mount Prospect Partners, LLC, approached Pochter in January 2006 offering to buy out BD's interest in the joint venture for $200,000 (G. Decl. ¶6). Gendell alternatively offered Pochter the opportunity to buy out Gendell Busse Partners' own 50% share at the same price (id.). Pochter declined both alternatives at that time (id.). Over the next several months, however, Pochter reconsidered the matter (id. ¶7), and in late September 2006 an agreement was reached for the sale of BD's interest for $200,000 (id. ¶8).

On October 4 a draft agreement documenting the sale was sent to Pochter, who rejected it because he also wanted to be released from his guaranty of the mortgage on the Land (id.). Gendell's employees procured the necessary documentation from the bank for that purpose, and on October 19 they told Pochter that the

---

[3] One of Movants' evidentiary submissions was a declaration by Gendell, cited here as "G. Decl.--."

release documents would be ready by October 23 (the next Monday) and that a check for $200,000 would be ready not later than October 24 (id. ¶¶8-10). Pochter signed the release papers and picked up the check not later than October 25 (id. ¶¶11-12).

Pochter did not inform Moede or Movants of the sale (D. St. ¶27; see M. St. ¶¶41-42). Instead he sent an email to Moede and Movants on October 24, stating only that he had received an offer to sell the Land to Gendell for $200,000 and that he recommended going forward with the sale (D. St. ¶¶25-26).[4] Michelson then called Gendell to confirm that he had made such an offer. Gendell responded that the deal was already done (having been agreed to some two weeks earlier) and that all that remained was for Pochter to pick up the check payable to BD (G. Decl. ¶11). Michelson called again the next day and was told Pochter had indeed picked up the check (id. ¶12).

After learning of Pochter's dissembling, Sandler called and emailed Pochter to discuss both Pochter's lie and the return of Movants' investments (S. Decl. ¶¶27-28). At some point during their interchange Pochter told Sandler that BD had $107,000 on hand and that he believed wind-up costs for BD would total $12,000 to $14,000 (D. St. ¶29). Sandler then demanded that Movants receive $29,000 each--an amount representing what he

---

[4] Sandler says that Pochter also called him--and he believes that Pochter called Miller and Michelson as well--the day before he sent the email (S. Decl. ¶23).

4

believed to be each Movant's 10% interest in BD's cash on hand following the sale.[5] Sandler also demanded that neither Moede nor Pochter receive any distribution until Movants had a chance to examine the books (S.Decl. Ex. G).[6] In response to Sandler's demand, each Movant received a check for $29,000 on or about October 27 (D. St. ¶33).

Moede was not copied on any of the emails responsive to Pochter, nor indeed did he know that the sale had been consummated (M. St. ¶¶41-44). And he was also wholly unaware of Sandler's demand to Pochter that Movants receive their distributions before any distributions were made to Moede or Pochter (see id.).

Sometime in November, after Movants had received their distributions, Miller called Moede's accountant Daryl Nirode ("Nirode"). During that conversation Miller told Nirode that the Land had been sold and that Movants had received their distributions (M. St. ¶44). Moede then directed Nirode to communicate with Pochter to arrange for Moede's distribution from the proceeds of the sale (id. ¶33 [sic -- should be M. St. ¶45,

---

[5] BD's bank statement for October 2006 shows three deposits totaling $307,000 and four withdrawals totaling $232,400.

[6] Sandler states that he was concerned throughout the existence of BD that Pochter and Moede had not fully contributed their capital and that he wanted to examine the books to determine the actual ownership interests of each investor. It seems that Sandler and the other Movants thought that each of them might be entitled to more than 10% of BD.

5

because it directly follows M. St. ¶44]).

When Nirode did so, Pochter agreed to give Moede only $100,000 at that time (id.). Pochter sent Moede a check in that amount in mid-December, but he stopped payment on the check before it could be honored. In late December Pochter sent Moede a second check, but Moede could not cash it because of insufficient funds (id.).

Pochter later disappeared, and in June 2007 Moede obtained a default judgment against him in this action. Moede has been unable to collect on the judgment.

### Breach of the Agreement

As this Court has previously said, there is no dispute that the Agreement was a legally binding contract among the parties. Moede claims two breaches of the Agreement: (1) Movants' approval of the sale of the Land without his approval or consent, in violation of its Section 6.3, and (2) Movants' demand for and acceptance of distributions from the sale that were not matched by a proportional distribution to Moede (corresponding to their respective percentage interests in BD), in violation of its Sections 5.1 and 5.2.

**Approval of the Sale of Land**

Moede's claim that Movants breached the Agreement by approving the sale of the Mount Prospect land cannot survive the current summary judgment motions. Movants have submitted

6

supplemental evidence comprising the Gendell declaration and supporting exhibits--and that evidence shows the sale was complete <u>before</u> Pochter notified any of BD's other members--including Movants--of Gendell's offer.

Moede has not challenged the admissibility of that supplemental evidence, which clearly establishes that Pochter had negotiated and agreed to the sale of the Land well before his October 24 email to Movants and Moede. Because Movants played no part in approving the sale of the Land before it was consummated, as a matter of law they did not breach any provision of the Agreement in that respect. To be sure, <u>Pochter</u> did not comply with Agreement §6.3--but that does not support Moede's claim against <u>Movants</u>.

**Demand for and Acceptance of Unmatched Distributions**

But Moede's claim that Movants breached the Agreement by their improper conduct in connection with the distributions from the proceeds of sale stands on a wholly different footing.[7]

---

[7] Agreement Art. 5 reads in relevant part:

> 5.1 <u>Distributions</u>. Subject to ARTICLE 6, distribution shall be made to the Members at such times an in such amounts as the Manager shall determine, in proportion to the Members' Percentage Interests at the time of such distribution....
>
> 5.2 <u>Right to Distributions</u>. No Member shall have the right to demand or receive any distribution until the time (and on the same terms as) such distribution is made to the Members generally....

7

Disputed issues of fact exist both as to the amount of money available to BD after the sale of the Land and as to Movants' actions in demanding their distributions.[8]

Movants claim that the $29,000 each received was 10% of the cash Pochter claimed to have on hand, so that they did not receive disproportionate distributions. Despite Moede's objections as to evidentiary admissability, there is no hearsay problem posed by Movants' tendering of Pochter's statements that BD had $307,000 on hand and that wind-up costs would be approximately $12,000 to $14,000. Those statements have been offered not for their truth but rather for the effect the statements had on each of them (see Fed. R. Evid. 801(c)). Those statements about BD's assets could reasonably be argued to have led Movants to believe that each of them could anticipate receiving at least $29,000.

But Sandler's demand on behalf of Movants (himself included) that Pochter distribute that amount to each of them before any moneys were paid out to Pochter or to Moede was not only violative of his obligations but profoundly disturbing. After all, the very essence of the limited liability company structure

---

[8] In fact, it is unduly charitable to Movants to describe the latter subject as posing "disputed issues of fact." As the later discussion reflects, the facts as to Movants' demands and the factual consequences are really uncontroverted -- what are in dispute instead are the legal consequences of those actions.

8

requires its non-manager members (such as Sandler and the other Movants) to forgo active involvement in such decisions as are committed to the manager member or members.[9] If Sandler had a legitimate concern that Moede's handling of his contribution obligations had disentitled him to proportionate treatment in terms of his percentage of ownership (a question left for the future, and hence one on which this opinion expresses no substantive views[10] ), there were legitimate means available to preserve the status quo until that issue could be addressed--but the exercise of self-help by shutting Moede off from financial participation while Sandler and the other Movants "got theirs" was not among them.

Indeed, it is plain that Movants recognized that their receipt of such preferential distribution treatment could result in an overage. Sandler prepared a memorandum detailing the partial distribution, which stated in part (S. Decl. Ex. H):

---

[9] It should be remembered that the Act confers a favored position--insulation from personal liability for company obligations--on the company's members. And it exacts a price for that benefit--for example, by specifying fiduciary duties in Act §15-3. It was a clear abuse on Sandler's part not only to ignore but to flout outright his fiduciary duties as defined there. And because Sandler is himself a lawyer, his advancement of his own self-interest in preference to that of a fellow non-manager member such as Moede is particularly unacceptable.

[10] That question is rife with disputed issues of fact, as noted by this Court in denying Movants' earlier motion for partial summary judgment on their counterclaim for breach of contract.

9

> If...it is determined that Messrs. Michelson, Miller and
> Sandler received over distributions, they shall refund their
> proportionate share based upon their percentage in the
> partnership agreement to the partnership....[11]

By demanding distribution at an earlier time and under different circumstances than any potential distributions to Moede and Pochter, Movants received a preferential distribution that they expressly recognized could prove to be disproportionate. They cannot now disclaim responsibility for that known risk.

This opinion has already referred to Sandler's stated concerns about the level of Moede's entitlement to company funds. That subject calls for some elaboration, for Movants assert that they intended to delay Moede's and Pochter's distributions only until such time as the books could be examined. But that does not explain away their successful demand to jump the gun on any such examination by getting their distributions up front.[12] Their demand expressly stated that they wanted their money immediately.

As Movants have characterized the matter, they were entitled to at least $29,000 each but might receive an even greater

---

[11] [Footnote by this Court] In addition, the memorandum went on to provide that if Movants were determined to have received less than their due, they would promptly be paid their proper share.

[12] Movants also state that Pochter didn't abide by their instruction, but that is not borne out by the facts. Each Movant received his demanded $29,000 before Moede received any distribution. In fact, it is undisputed that Moede never received his distribution at all.

distribution after inspection of the books, because they thought neither Moede nor Pochter had fully funded his capital contribution. Most simply put, that belief and thought might perhaps attempt to rationalize Movants' self-preferential course of conduct, but they cannot justify it in legal terms.

Although what has been said to this point plainly calls for the rejection of Movants' effort to obtain summary judgment, a bit should be added about still another open factual issue--this one disputed, as the matters adverse to Movants and already set out are not. Despite Movants' claim that BD's October bank statement proves that it had $307,000 in cash on hand for distribution, the actual amount available is unknown. Moede correctly points out that even though the bank statement shows deposits of $307,000--an amount consistent with what Movants say Pochter told them--it also shows withdrawals of $232,400. Absent evidence of where that money (other than the $87,000 distributed to Movants) went, Movants' claim that they received only their due is not supported. And that is separate and apart from the previously explained flaws in their position.

In sum, Movants demanded and received distributions from BD before and on different terms than any even attempted distribution to Moede. Moreover, even those preferred distributions may not have been proportionate, something that Movants recognized when Sandler made the improper demand on their

behalf. For more than one reason, then, it cannot be said that Movants did not breach the Agreement by demanding and receiving their preferred distributions.

**Violation of the Act**

Moede has also alternatively pleaded claimed violations of the Act by Movants. In that respect, of course, the parties are subject to the Act only to the extent it is not trumped by the Agreement (Act §15-5). In the absence of a showing that the Agreement is invalid[13] or otherwise inoperative, the Agreement would govern to the extent that it modifies the Act.

Movants correctly point out (D. Mem. 9-12) that the Agreement supersedes the Act by requiring consent of members holding only a majority of the percentage interests to authorize the sale of the Land and by providing for distributions in proportionate--not equal--shares. Relatedly, any Act provisions that would otherwise require distributions in equal shares upon BD's dissolution are inoperative, because the Agreement provides instead that distributions upon dissolution will be made proportionally (D. Mem. 10).

With BD being manager-managed, and with no assertion that Movants exercised the authority of a manager (except, of course, for their already-discussed intrusion on the manager's role by their improper demand for preferred distributions), the one

---

[13] Moede has not asserted that the Agreement is invalid.

reported Illinois case that addresses any provision of Act §15-3 teaches that Movant owed no duty to BD or to Moede simply by virtue of being members of BD (Act §15-3(g)(1); Katris v. Carroll, 362 Ill. App. 3d 1140, 842 N.E.2d 221 (1st Dist. 2005)).[14] But that principle, as set forth in the cited section of the Act and in the Katris opinion's analysis of Act §15-3(g)(3), does not take account of the real focus of Movants' breach of the Act. Assuredly with the facts viewed through a pro-Moede lens, and indeed as admitted by Movants themselves, Movants have clearly violated their fiduciary obligations to fellow member Moede as defined in Act §§15-3(a) through 15-3(d).

In sum, the same conduct by Movants that bars summary judgment in their favor stemming from their demand for and receipt of preferred distributions precludes summary judgment in their favor as to Moede's corresponding claim under the Act.

---

[14] Because Katris did not speak to the other provisions of Act § 15-3 -- the ones that really do apply to this case -- this Court has no occasion to opine on the question whether the case correctly reflects Illinois law (that is, it has no occasion to attempt a prediction as to whether the Illinois Supreme Court would rule the same way if it were confronted with the issue). But it is worth noting that a highly respected scholar, Loyola Law School Professor Charles Murdock, has trenchantly criticized Kurtis as having "reached the wrong result, possibly because the appropriate basis of liability was not presented to the court by counsel" (Murdock, 7 Ill. Prac. Business Organizations §5.15 (2004) -- the section dealing with "Fiduciary duties" in the "Limited Liability Company" chapter). As Professor Murdock puts it, "the statute as analyzed [in Katris] does not make sense," and he urges a view of members' fiduciary duties paralleling what is next described in the text of this opinion.

That claim also survives for future resolution.

## Conclusion

For the reasons stated in this opinion, Movants' motion for summary judgment is granted as to Moede's claim that they breached the Agreement by assenting to the sale of the Land. But their Rule 56 motion is denied as to Moede's claims that they breached both the Agreement and the Act by demanding and taking preferred distributions. This action is set for a status hearing at 8:45 a.m. December 2, 2009.

_____
Milton I. Shadur
Senior United States District Judge

Date: November 20, 2009